UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. CR 10-863-SVW |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER GRANTING DEFENDANT |
| v. | ) | UNDERWOOD'S MOTION TO SUPPRESS |
| | ) | |
| JOHN UNDERWOOD, | ) | [288] |
| | ) | |
| Defendant. | ) | |
| | ) | |

## I.  Introduction

The Court and parties are familiar with the broader facts of this criminal case, involving a conspiracy to distribute MDMA (ecstasy) and methamphetamine.  Only facts relevant to the present Motion are recounted here.  John Michael Underwood ("Underwood"), one of the alleged conspirators, has filed a Motion to Suppress evidence seized from his house on Mansa Drive on July 22, 2010.  The evidence – 33 kilograms of cocaine, $417,000 in cash, 104 ecstasy pills, packaging material, and a pay/owe sheet – was seized pursuant to a state search warrant issued on July 22, 2010.

### A.  Facts

#### (1)  Federal Warrants & Underwood's Arrest

On July 15, 2010, the Government obtained federal arrest and

search warrants ("the federal warrants") for the arrest of Underwood and the search of what was believed to be his residence on Cantrece Lane ("the Cantrece Residence"). Underwood does not challenge the federal warrants.

The federal warrants were based on the affidavit of DEA Agent Johnson, who stated that he believed Underwood worked as a courier delivering cocaine and ecstasy. Agent Johnson disclosed that on April 14, 2010, DEA agents observed Barrera, a known conspirator,[1] meet with Underwood in a parking lot. Underwood gave Barrera two heavy crates. The crates were identified by Agent Johnson as similar to crates containing ecstasy that were seized on June 15, 2010 as part of the investigation. Agent Johnson's affidavit also disclosed incriminating wiretapped communications between Underwood and known conspirators.

Additionally, the vehicle Underwood used to deliver crates on April 14, 2010 was traced to the Cantrece Residence. On April 27, 2010, officers had conducted surveillance of the residence and observed two vehicles registered to Underwood parked in the driveway, including the vehicle used to transport the crates.

On July 22, 2010, a week after the federal warrants were issued, officers served the federal warrants at the Cantrece Residence, only to find that Underwood's mother, not Underwood, resided at the location. After a search, no evidence of drug trafficking was found. Underwood's mother gave the officers a different address for Underwood – at a

---

[1] The federal affidavit disclosed various wiretapped phone conversations in which Barrera allegedly arranged drug transactions and corroborated these conversations with observations of the transactions. Although the issue of whether the federal affidavit supported probable cause is not before the Court, the federal affidavit appears to support probable cause.

residence located on Mansa Drive (the "Mansa Residence").

Subsequently, officers went to the Mansa Residence to execute the federal arrest warrant. Officers knocked on the door, Underwood came outside, and he was arrested. Officers conducted a protective sweep of the residence. During the sweep, officers observed a personal-use amount of marijuana in a clear zip-lock bag in the living room.

After Underwood's arrest, Agent Johnson confirmed his belief that the Mansa Residence was Underwood's actual residence. Detective Kaiser, a local police officer, was directed by his superior to obtain a state search warrant for the Mansa Residence.

### (2)  State Affidavit & Search Warrant

The state search warrant, the warrant challenged in Underwood's Motion, was issued on July 22, 2010, a week after the federal warrants were issued. The state search warrant was supported by the affidavit of Detective Kaiser ("the state affidavit").

After describing Detective Kaiser's qualifications and his experience in drug investigations, the affidavit stated the following:

<u>Narrative</u>

> On 7-15-10, I, Detective Kaiser, learned the following from US Drug enforcement Agent Peter Johnson of the LA Office, Group 4:
>
> On July 15, 2010, United States Magistrate Judge Victor Kenton signed a federal arrest warrant for John Michael Underwood ("Underwood") and a federal search warrant for Underwood's suspected residence at 12338 Cantrece Lane, Cerritos, CA. Underwood is a courier for a multi-hundred thousand pill MDMA drug trafficking organization ("Luong DTO"). On April 14, 2010, Drug Enforcement Administration ("DEA") Special Agents and Beverly Hills Police Department ("BHPD") Detectives observed Underwood deliver two wooden crates to known co-conspirators Jimmy Luong ("Luong") and Tony Barrera ("Barrera").

3

> Based on other seizures in this investigation,
> I believe the crates contained approximately
> 260,000 pills of MDMA.

According to Detective Kaiser, the above "narrative" section summarizes the information provided to Detective Kaiser by Agent Johnson and is written from Agent Johnson's perspective.[2]  Kaiser Decl. ¶ 6.

After the "narrative" section quoted above, the affidavit continued to a new section, "Evidence of Crimes Will be Obtained on the Subject Premises." This section provided generalized opinions about the behavior of drug traffickers.  The section stated that drug traffickers often maintain evidence of drug crimes at their residence.  It also stated that traffickers commonly "front" or provide illegal controlled substances to their clients on consignment and therefore keep records of money owed and payments made.  The section stated that based on intercepted conversations and surveillance observations, Agent Johnson believed that most of the higher level members of the Luong organization were given ecstasy through "fronting" arrangements.

Next, under the same "Evidence of Crimes Will be Obtained on the Subject Premises" heading, Detective Kaiser described his role in serving the federal warrants at the Cantrece Residence on July 22, 2010.  Detective Kaiser stated that officers discovered that the residence actually belonged to Underwood's mother, who provided

---

[2] Indeed, of all the statements in the state affidavit, Detective Kaiser only had personal knowledge as to his own training and experience, and the events surrounding Underwood's arrest on July 22, 2010.  The remainder of the state affidavit is based upon Agent Johnson's knowledge.  While this procedure is disfavored by some courts, it is not a basis for suppression.  <u>Bennett v. City of Grand Prairie</u>, 883 F.2d 400, 407 (5th Cir. 1989).

officers with Underwood's home address (the Mansa Residence). He then narrated his involvement in Underwood's arrest at the Mansa Residence:

> I knocked on the front door and it was answered by John Underwood. I informed him of the federal arrest warrant and assisted DEA Agent Nickerson in placing him under arrest. For officer safety reasons, my squad conducted a protective sweep of the residence. During the sweep, Detective Davis saw an amount of what appeared to be marijuana in a zip loc baggie on a table in the living room. John Underwood has declined to consent to a search of his residence. I request that a warrant be searched at the location to recover evidence as described in the above "For the following."

The "For the following" section referenced by Detective Kaiser lists a broad array of evidence to be seized, including records of drug transactions, bank account records, supplier lists, phones, drugs such as Ecstasy, drug paraphernalia, currency over $500, personal records such as bills, photographs and videos involving drugs, and firearms. Based on Detective Kaiser's affidavit, a judge of the Los Angeles Superior Court issued a search warrant for the Mansa Residence. A search of the Mansa Residence resulted in a seizure of 33 kilograms of cocaine, $417,000 in cash, 104 ecstasy pills, packaging material, and a "pay/owe" sheet.

**II. Legal Standard**

Unreasonable government intrusion into the home is the chief evil against which the Fourth Amendment is directed. <u>Payton v. New York</u>, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Fourth Amendment prohibits a general warrant. <u>Boyd v. United States</u>, 116 U.S. 616, 625, 6 S.Ct. 524, 29 L.Ed. 746 (1886); <u>Andresen v. Maryland</u>, 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). In issuing a

search warrant, a neutral judge must determine that there is a "fair probability that ... evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (quoting Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)) (quotations omitted). "Probable cause is determined by looking at the totality of circumstances. . . ." United States v. Nielsen, 371 F.3d 574, 579 (9th Cir. 2004).

In determining whether probable cause was established for the search, the Court considers information provided to the judge issuing the warrant, including reasonable inferences drawn by the affiant. 2 LaFave, Search and Seizure, §3.2(d) (4th ed. 2008) at 49 [hereinafter "LaFave"]. However, "probable cause can[not] be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the underlying circumstances upon which that belief is based." United States v. Ventresca, 380 U.S. 102, 108-09 (1965) (internal quotations omitted); see also Gates, 462 U.S. at 239 ("An affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause, and . . . wholly conclusory statement[s] . . . fail[] to meet this requirement."); United States v. Dubrofsky, 581 F.2d 208, 212 (9th Cir. 1978) ("A search warrant may not rest upon mere affirmance or belief without disclosure of supporting facts or circumstances."). "The requirement that the affidavit recite the facts relied upon by the affiant to support the conclusion that probable cause exists is simply a part of the larger principle that the official charged with acting on the affidavit must be able to judge for himself the persuasiveness of those facts, as well as make an independent

determination that they establish probable cause." <u>United States ex</u>
<u>rel. Grano v. Anderson</u>, 446 F.2d 272, 275 (3d Cir. 1971).

"A magistrate judge's finding of probable cause is entitled to
great deference. . . ." <u>United States v. Clark</u>, 31 F.3d 831, 834 (9th
Cir.1994), *cert. denied*, 513 U.S. 1119, 115 S.Ct. 920, 130 L.Ed.2d 800
(1995); <u>accord</u> <u>United States v. Krupa</u>, 633 F.3d 1148, 1151 (9th Cir.
2011); <u>Nielsen</u>, 371 F.3d at 579 (noting a magistrate judge's finding of
probable cause is reviewed for clear error). Furthermore, "[i]n
borderline cases, preference will be accorded to warrants and to the
decision of the magistrate issuing it." <u>United States v. Terry</u>, 911
F.2d 272, 275 (9th Cir.1990) (citation omitted). "[T]he duty of a
reviewing court is simply to ensure that the magistrate had a
substantial basis for concluding that probable cause existed." <u>Gates</u>,
462 U.S. at 238 (internal corrections and quotations omitted).

**III. Discussion**

Underwood argues that the state search warrant failed to provide
sufficient facts establishing probable cause for a search of the Mansa
Residence. Additionally, Underwood argues that the information in the
affidavit supporting the state search warrant was stale and does not
support probable cause that the items to be seized in the affidavit
would be found there. Finally, Underwood contends the good faith
exception of <u>United States v. Leon</u> is inapplicable.

**A. Lack of Probable Cause in State Affidavit**

Underwood's position is that the state affidavit is wholly
conclusory and does not present any facts supporting probable cause.
The Government disagrees, and points to the following four statements
in the state affidavit:

(1) "Underwood is a courier for a multi- hundred thousand pill MDMA drug trafficking organization";

(2) "On April 14, 2010, Drug Enforcement Administration ("DEA") Special Agents and Beverly Hills Police Department ("BHPD") Detectives observed Underwood deliver two wooden crates to known co-conspirators Jimmy Luong ("Luong") and Tony Barrera ("Barrera"). Based on other seizures in this investigation, I believe the crates contained approximately 260,000 pills of MDMA";

(3) Agent Johnson's descriptions of "fronting" in paragraph 2 of the state affidavit; and (4) that marijuana was observed in plain view upon a protective sweep of Underwood's home.

The Court concludes the search warrant failed to establish probable cause to search the Mansa Residence for evidence of a multi-hundred thousand pill MDMA drug trafficking conspiracy.

**(1) "Underwood is a courier"**

Detective Kaiser's affidavit baldly asserts that he learned from Agent Johnson that Underwood was a courier[3] for a multi-hundred thousand pill MDMA drug trafficking organization. The facts supporting the basis of Agent Johnson's conclusion are not disclosed in the affidavit. In an analogous situation, probable cause is lacking when an informant's conclusory allegations, but not the factual bases for the informant's knowledge, are offered to support probable cause. See, e.g., Aguilar v. Texas, 378 U.S. 108, 114 (1964) ("Although an affidavit may be based on hearsay information and need not reflect the

---

[3] The state affidavit does not define "courier." A courier is typically one that carries a message, information, or packages from one point to another. In the present context, a courier is commonly known as a "runner of contraband or illicit materials." Webster's Third New International Dictionary (Unabridged) (1981).

direct personal observations of the affiant, the magistrate must be informed of some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were. . . . [o]therwise the inferences from the facts which lead to the complaint will be drawn not by a neutral and detached magistrate. . . but instead . . . by an unidentified informant.") (internal citations and quotations omitted).

Although the parties do not discuss this issue, the Court acknowledges that other law enforcement agents' observations are assumed reliable, unlike informants' observations, which must be supported by the affiant's basis for concluding the statements are reliable. See Ventresca, 380 U.S. at 111 ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number."); United States v. Lapsins, 570 F.3d 758, 764 (6th Cir. 2009) ("[I]n general, another law enforcement officer is a reliable source and consequently no special showing of reliability need be made as a part of the probable cause determination.") (quoting LaFave § 3.5(a)) (internal quotation marks and corrections omitted). However, though *observations* of other police officers may be relied upon, the affiant may not simply state the bare-boned conclusions of other officers as a basis for probable cause.[4]  It is clear that if Agent Johnson, not

---

[4] One exception was identified by the Supreme Court in Jaben v. United States, 381 U.S. 214 (1965).  In Jaben, the defendant in a tax evasion case objected to the conclusory statements of an IRS agent in a complaint, which the defendant alleged failed to establish probable cause.  The Court held that the magistrate could rely on the IRS agent's unexplained allegation that the defendant's income was $40,001.76 instead of $17,665.31 in finding there was probable cause. The Court reasoned that "[e]stablishment of grounds for belief that

Detective Kaiser, had made the statement "Underwood is a courier for a drug trafficking organization" in an affidavit, the statement would be conclusory. The conclusory nature of this statement is not improved because Detective Kaiser relied upon the conclusions of Agent Johnson.[5] If an affiant could simply circumvent the requirement to include a factual basis supporting probable cause by relying on the bald conclusions of another law enforcement officer, the detached and neutral magistrate required to approve the search may as well be replaced by a rubber stamp.[6]

---

the offense of tax evasion has been committed often requires a reconstruction of the taxpayer's income from many individually unrevealing facts which are not susceptible to a concise statement in a complaint." Id. at 224. In no reasoning, the Court specifically distinguished other offenses that "are subject to putative establishment by blunt and concise factual allegations, e.g., 'A saw narcotics in B's possession. . . .'" Id. at 223. This case does not present a situation analogous to Jaben, which involved a complex reconstruction of the taxpayer's income. In fact, whether Underwood is a courier in a drug trafficking organization presents a situation that the Court in Jaben directly distinguished – where conclusions can be supported by "blunt and concise" factual allegations, such as "A saw narcotics in B's possession." The Court recognizes of course that probable cause in drug cases need not always be based on a smoking-gun type observation, but may also be based upon facts allowing a magistrate to draw reasonable inferences that probable cause exists.

[5] Simply put, Agent Johnson's reliability does not substitute for a failure to disclose the factual basis of Agent Johnson's conclusions. Cases where an affiant relies upon the observations of other officers involve disclosures of facts, not mere conclusions. For example, in Ventresca, the affidavit included numerous detailed observations of investigators regarding the smell of mash emanating from a dwelling. Ventresca, 380 U.S. at 111-12. In Lapsins, the affidavit included another law enforcement officer's identification that a photographed naked child was a victim from another case. Lapsins, 570 F.3d at 762. By contrast, in this case, the state affidavit does not include any facts supporting Agent Johnson's conclusions.

[6] Nor is this situation similar to Whiteley v. Warden, 401 U.S. 560 (1971), where the Supreme Court laid out the "fellow officer" rule. In cases involving warrantless arrests, the Court has held that

10

## (2) Delivery of Wooden Crates

Detective Kaiser's affidavit also states that he learned the following from Agent Johnson:

> On April 14, 2010, Drug Enforcement Administration ("DEA") Special Agents and Beverly Hills Police Department ("BHPD") Detectives observed Underwood deliver two wooden crates to known co-conspirators Jimmy Luong ("Luong") and Tony Barrera ("Barrera"). Based on other seizures in this investigation, I believe the crates contained approximately 260,000 pills of MDMA.

Motion Ex. B [hereinafter "State Affidavit"].

### (a) Conclusion that Luong and Barrera Are Known Co-Conspirators

As with the statement in subsection (1), although the affidavit asserts that Luong and Barrera are "known co-conspirators," the affidavit does not present any facts supporting this conclusion.[7] Thus, the allegation that Underwood delivered crates to "known co-

---

officers may rely on conclusory directives and requests by fellow officers to effectuate an arrest, so long as the directive can be traced to an officer with personal knowledge that establishes probable cause. See LaFave § 3.5(b). However, the "fellow officer" rule has not been applied in the search warrant context. This is because whether or not an officer has facts that could establish probable cause is irrelevant if those facts are not disclosed to the magistrate judge issuing the warrant. Ninth Circuit law pertaining to establishing probable cause for a search warrant is clear: "This Court has repeatedly held that all data necessary to show probable cause for the issuance of a search warrant must be contained within the four corners of a written affidavit given under oath." United States v. Luong, 470 F.3d 898, 904 (9th Cir. 2006) (quoting United States v. Gourde, 440 F.3d 1065, 1067 (9th Cir.2006) (en banc)) (internal quotation marks and corrections omitted); see also United States v. Hove, 848 F.2d 137, 140 (9th Cir.1988).

[7] By contrast, the *federal* affidavit presented wiretapped conversations of Luong and Barrera, and corroborating observations of drug transactions over a course of several months.

11

conspirators" is a wholly unsupported conclusion.

**(b) Conclusion that Crates Contain Ecstasy**

Even more importantly, the affidavit presents no factual support for Detective Kaiser's belief that "the crates contained approximately 260,000 pills of MDMA." Though the affidavit refers to "other seizures in this investigation," it does not describe those seizures in any way.

The Government is correct that the statement does allege one fact – that Underwood was observed delivering two wooden crates on April 14, 2010.  However, the crates are not described  in the state affidavit. For example, the state affidavit does not allege that the crates that Underwood delivered resembled other seized crates containing ecstasy or that an officer saw ecstasy in the crates.  The affidavit does not even allege that the other seizures involved crates.  Unlike cases involving reasonable inferences of probable cause drawn from *facts*, no factual description of the crates is presented to allow a reasonable inference that the crates contained ecstasy.[8] C.f. United States v. Prandy Binett, 995 F.2d 1069, 1071-73 (D.C. Cir. 1993) (holding that detective's observation of a duct-tape wrapped block typically used to transport drugs in shopping bag after suspect's elusive answers and movements to avoid the detective allowed for reasonable inference that block contained drugs). The Court does not suggest that cases such as Binett create the minimum description necessary to allow a reasonable inference that the crates in this case contained ecstasy.  The Court holds only that the disclosure of the delivery of undescribed crates

---

[8] Though the *federal* affidavit characterized the crates as "heavy" and also stated the crates resembled other crates seized during the investigation that contained ecstasy, the state affidavit did not present these facts.

alone is not a substantial basis to support probable cause.

### (3)  Description of "Fronting" and Surveillance

The Government argues that the following statement that Detective Kaiser learned from Agent Johnson supports the conclusion that the crates contained ecstasy:

> Traffickers maintain records relating to the manufacture, transportation, ordering, sale, and distribution of illegal controlled substances. Traffickers commonly "front" (provide illegal controlled substances on consignment) illegal controlled substances to their clients and thus keep some types of records concerning monies owed and payments made. *Based on intercepted conversations over TT #1-#4, #5-7 and my surveillance observations, I believe most of the higher level members of the Luong DTO have been given MDMA in this manner.*[9]

---

[9] The statement is in the "Evidence of Crimes Will Be Obtained at the Subject Premises" section of the state affidavit. The statement is also the subject of Underwood's <u>Franks</u> challenge because Underwood argues that the representation "I believe" is false and misleading. According to Underwood, the statement was intended to mislead the issuing judge into believing that Detective Kaiser, not Agent Johnson, had the belief in question. The Court does not reach the <u>Franks</u> issue. However, the Government contends that because the statement is the subject of a <u>Franks</u> challenge by Underwood, which requires a showing that officers intentionally made a material misstatement that affected the probable cause determination, Underwood has essentially admitted that the statements support probable cause. This argument is unavailing. The Court does not find that this conclusory statement supports probable cause. Furthermore, the Government's argument ignores the basic principle that a party can generally take alternative legal positions without prejudice to either position. Moreover, here, the legal positions are not necessarily contradictory and nor is Underwood "playing fast and loose" with the Court. <u>See</u> <u>Rissetto v. Plumbers and Streamfitters Local 343</u>, 94 F.3d 597, 601 (9th Cir. 1996) (considering judicial estoppel because of concern that plaintiff was "playing fast and loose with the court"). Underwood's position is simply that the warrant is unsupported by facts, but if the Court were to find that the statements were non-conclusory, he argues that a <u>Franks</u> hearing is necessary because the affiant allegedly misrepresented the identity of the source of the statement.

State Affidavit (emphasis added).

The Government argues that the emphasized portion of the statement provides factual support for the conclusion that Underwood was observed delivering crates containing 260,000 pills of ecstasy. However, this argument is unavailing.

First, the statement is wholly conclusory. The affidavit does not disclose any facts that support the conclusion that individuals who received crates from Underwood are "higher level members of the Luong DTO." Nor does it disclose the substance of the wiretapped conversations and the referenced surveillance observations.[10]

Second, even if the statement was not conclusory, no reasonable inference could arise from the statement that the surveillance observations being referred to were of the delivery of crates, rather than "fronting" arrangements. The text surrounding the statement clearly shows that it was made to support the proposition that the higher level members of the Luong DTO were given MDMA through "fronting" arrangements. Therefore, the statement alleges that records of monies owed for past transactions would probably exist on the subject premises for an extended period of time. However, the statement does not relate to whether the crates contained ecstasy, rather, it relates to the financial arrangements utilized by the Luong DTO in obtaining drugs.[11]

_____

[10] By contrast, the emphasized portion of the statement is explained in the *federal* affidavit, which describes at length the conversations between various alleged conspirators over a period of months and corroborates the substance of the conversations with physical observations of drug transactions.

[11] Additionally, the organization of the affidavit and the heading under which the statement is found further support the interpretation

### (4) Observation of Marijuana in Plain View

The parties dispute whether or not the observation of marijuana presented in the state affidavit was the result of an illegal protective sweep.  The debate is largely academic.  The Court finds that even if the sweep was legal, the observation of personal use marijuana did not support probable cause – either alone or in conjunction with the other statements in the affidavit – to search Underwood's residence for ecstasy, firearms, phones, pay/owe sheets, supplier lists and bank account records.  Indeed, the Fourth Amendment requires "a nexus . . . between the item to be seized and criminal behavior."  Warden v. Hayden, 387 U.S. 294, 307 (1967).  Here, the items sought in the search, including bank records, supplier lists, customer lists, firearms, and phones, may reasonably have a nexus to what the affidavit stated was a "multi-hundred thousand pill MDMA drug trafficking organization."  However, the items sought do not have a nexus to the possession of a small amount of marijuana.  Nor does the observation of a personal use amount of marijuana create a reasonable inference that evidence of a drug trafficking conspiracy would be present in the Mansa Residence.

The Court concludes that the search of the Mansa Residence violated the Fourth Amendment.  The only two facts presented – a single three month old delivery of undescribed crates and an observation of a personal use amount of marijuana – failed to make even a colorable argument that probable cause existed.  Naked assertions that the crates

that the statement is unrelated to the delivery of crates.  The statement is made in an entirely different section of the warrant ("Evidence of Crimes Will Be Obtained at the Subject Premises") than the section containing the statement about delivering crates (the "Narrative" section).

Underwood delivered contained hundreds of thousands of pills of ecstasy and that evidence of a multi-hundred thousand pill MDMA drug trafficking conspiracy would be found at the Mansa Residence are wholly unsupported by these facts.

## B. Staleness of Delivery

Underwood also contends that the information in the affidavit is stale. A warrant must be supported by "facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." Sgro v. United States, 187 U.S. 206, 210 (1932). Courts consider a variety of factors in determining whether there is probable cause that the evidence is still in place. United States v. Foster, 711 F.2d 871, 878 (9th Cir. 1983) ("The passage of time is not necessarily a controlling factor in determining the existence of probable cause. The court should also evaluate the nature of the criminal activity and the kind of property for which authorization to search is sought."); Andresen v. State, 24 Md. App. 128 (1975) *aff'd sub nom.* Andresen v. Maryland, 427 U.S. 463 (1976) (considering the character of the crime, the criminal, the thing to be seized, and the place to be searched). The staleness inquiry is another component of the overall inquiry, which requires that the factual information provided in the affidavit establishes a fair probability that the evidence sought will be found at the location sought to be searched. See United States v. Spikes, 158 F.3d 913, 923-24 (6th Cir. 1998).

In this case, the Government obtained the state search warrant approximately three months after Underwood was observed delivering crates. Underwood argues it was improbable that evidence of the single alleged delivery of crates containing ecstasy existed in his home after

three months.

The Government contends that the recently observed marijuana refreshes the staleness of older information in the affidavits. Historical information, when coupled with more recent information, may revive the probability that the evidence sought would be present at the location searched. See, e.g., United States v. Alvarez, 358 F.3d 1194, 1203-04 (9th Cir. 2004) (rejecting staleness argument because three year old information was corroborated by evidence of recent telephone communications with co-conspirators); see also United States v. Vaandering, 50 F.3d 696, 700 (9th Cir.1995) (finding twenty-two month old information not stale when "the older information was coupled with recently obtained information"); United States v. Liland, 254 F.3d 1264 (10th Cir. 2001) (information regarding ongoing drug trafficking was four months old, but information was not stale because affidavit showed defendant kept drugs in storage unit and that he was still renting and visiting the unit a few days before warrant issued); United States v. Magluta, 198 F.3d 1265, 1268-69 (11th Cir. 1999) *vacated in part on other grounds by* 203 F.3d 1304 (11th Cir. 2000) (reasoning that in ongoing drug conspiracy case, old information in affidavit was not stale because it was contemporized by officers' observation of black gym backs covered by blankets, a safe, numerous papers, and large amounts of cash in plain view during a protective sweep).

The more recent information found to refresh older evidence in cases like Alvarez, Vaandering, and Magluta had some nexus to the items to be seized and the alleged criminal conspiracy. Here, however, the isolated observation of a small amount of marijuana does not support the likelihood that evidence of a three month old ecstasy delivery

remained in the residence of a courier.

Nor does the observation of marijuana for personal use coupled with the observation that Underwood delivered crates believed to be filled with ecstasy on *one occasion* (even assuming that belief was supported by facts in the affidavit) tend to show that the Mansa Residence contained evidence of a drug trafficking conspiracy three months later. There are cases involving repeated sales of drugs or protracted criminal activity where courts have rejected staleness challenges even when search warrants were not executed for weeks or even months after the events supporting probable cause occurred. See, e.g., United States v. Wright, 343 F.3d 849 (6th Cir. 2003) (probable cause even though information over 3 years old because of the continuing nature of the drug conspiracy); United States v. Foster, 711 F.2d 871, 878 (9th Cir. 1983) (finding that three month old drug sale was not stale because criminal conduct was of continuing nature since drugs were seen at residence on several occasions and defendant maintained phony records to deceive the IRS); cf. United States v. Johnson, 461 F.2d 285 (10th Cir. 1972) ("Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time. However, where the affidavit properly recites facts indicating activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant."); United States v. Wagner, 989 F.2d 69 (2d Cir. 1993) (probable cause stale when based on a single, small purchase of marijuana more than six weeks before search). Indeed, the Ninth Circuit has held that when an affidavit "establish[es] the existence of a widespread, firmly entrenched, and ongoing narcotics

operation in which [the defendant] played a pivotal role . . . staleness arguments lose much of their force." <u>United States v. Hernandez-Escarsega</u>, 886 F.2d 1560, 1566 (9th Cir. 1989).

Here, however, the state affidavit only provided *one instance* of participation in an allegedly ongoing drug conspiracy – the delivery of crates allegedly containing ecstasy on a single occasion.  No other facts, except those derived from this delivery of crates made three months ago, even attempted to connect Underwood to an ongoing drug trafficking conspiracy.  No evidence of wiretaps, contacts with other co-conspirators, or other criminal activity involving the conspiracy was presented.[12]  As discussed earlier, the only recent fact disclosed in the affidavit – having a personal use amount of marijuana – has no nexus to participating as a courier for a multi-hundred thousand pill MDMA drug trafficking organization.  Underwood correctly argues that a one-time sale such as this, even coupled with a later observation of personal use marijuana, is insufficient to establish Underwood's participation in an ongoing drug conspiracy.

"Where the affidavit recites a mere isolated violation it would not be unreasonable to imply that probable cause dwindles rather quickly with the passage of time." <u>Johnson</u>, 461 F. 2d at 287 (10th Cir. 1972); <u>see also United States v. Hython</u>, 443 F.3d 480, 485-86 (6th Cir. 2006) (holding that affidavit failed to establish an ongoing drug enterprise at a residence solely because one controlled drug transaction took place at the address and finding staleness because affidavit did not

---

[12] The Court notes that the Government possessed this information, but inexplicably failed to present it in the state affidavit.  However, whether or not the Government possessed the information is irrelevant – the Court's holding is based upon the facts disclosed within the four corners of the affidavit.

identify date when single buy occurred); <u>United States v. Tucker</u>, 638

F.2d 1292, 1299 (5th Cir. 1981) ("[A] primary consideration in

evaluating the staleness issue is whether the affidavit describes a

single transaction or a continuing pattern of criminal conduct.").[13]

The Government contends that generic statements in the affidavit –

that drug traffickers maintain records in their homes for long periods

of time – established probable cause that records would be present even

three months after the crate delivery.  The Government cites to <u>United</u>

<u>States v. Freeman</u>, 685 F.2d 942 (5th Cir. 1982), where the affidavit

demonstrated that the defendant, an alleged smuggler, had many aliases.

<u>Id.</u> at 950.  The court found there was probable cause to search for

passports, personal identification papers, and bank records despite the

fact that no additional evidence was gathered for seven months before

the issuance of the search warrant.  The court stressed that passports,

identification papers and bank records "could be reasonably expected to

be kept [in one's personal residence] for long periods of time."  <u>Id.</u>

at 952.

However, the reasoning of <u>Freeman</u> is unhelpful to the Government.

_____

[13] Although it is inferable from the affidavit that Agent Johnson was
engaged in an ongoing investigation, apart from the one-time delivery
of crates, there is no nexus between Underwood and that
investigation.
    Nor is this a case like <u>United States v. Dozier</u>, where the Ninth
Circuit rejected the defendant's argument that information supporting
his warrant was stale.  844 F.2d 701, 707 (9th Cir. 1988).  In
<u>Dozier</u>, marijuana plants had been observed at the defendant's
residence over five months before the search warrant was executed.
Nonetheless, the Ninth Circuit found that the lapse of time was not
controlling on the issue of staleness.  The court observed that
"marijuana cultivation is a long-term crime . . . [and] documentary
records sought are the type of records typically found to be
maintained over long periods of time."  <u>Id.</u>  In this case, the
affiant asserts (without support) that Underwood is a courier – not a
manufacturer or dealer of ecstasy.

Even taking the affidavit's assertions that "drug traffickers" maintain records for long periods of time at face value, these generalized statements about activities of "drug traffickers" are not linked to the habits of "couriers" like Underwood.  <u>See</u> State Affidavit.  Though the term "drug trafficker" is not expressly defined in the affidavit, the affidavit implies that a "drug trafficker" is a buyer and seller of illegal substances.[14]  <u>See</u> <u>id.</u> ("Traffickers typically will obtain and distribute controlled substances on a regular basis, like any distributor of a legitimate commodity. . . ."; "Traffickers maintain records relating to the manufacture, transportation, ordering, sale, and distribution of illegal controlled substances. . . ."; "When traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of . . . banks. . . ."; "Large scale traffickers must maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug businesses"; "Traffickers commonly receive telephone calls and messages . . . from individuals seeking to conduct narcotics transactions").  However, the affidavit asserts that "Underwood is a courier for a . . . drug trafficking organization," but does not assert that he is a "drug trafficker."

This situation is analogous to <u>United States v. Weber</u>, 923 F.2d 1338, 1341, 1344 (9th Cir.1991), where the affidavit presented evidence that two years prior to the issuance of the warrant, the defendant had

[14] This interpretation is supported by the common meaning of the term "trafficking" – which means to engage in business activity, or to buy and sell regularly.  <u>See</u> Webster's Third New International Dictionary (Unabridged) (1981).  Furthermore, as discussed <i>infra</i>, the distinction between a courier and a trafficker is not just based on dictionary definitions, but is supported by case law and the affidavit itself.

been sent child pornography advertisements, and that just before the issuance of the warrant, the defendant had ordered materials in response to a government generated advertisement for child pornography. The affidavit in <u>Weber</u> also included extensive generalized explanations regarding the activities of "pedophiles, molesters, and collectors," and the types of equipment these individuals typically maintain. However, the critical flaw in the affidavit was that the affiant failed to link "pedophiles, molesters, and collectors" to the defendant, whose only demonstrated interest in child pornography consisted of one placed order. <u>Id.</u> at 1345. Thus, the Ninth Circuit concluded that there was insufficient probable cause to search the defendant's residence for the type of evidence involved in producing and reproducing child pornography.[15] <u>Id.</u> As discussed earlier, the plain meaning of a "courier" is one who merely delivers items (in this context, contraband) but does not typically trade, buy, or sell the items being delivered. Case law also supports this distinction. <u>See United States v. Davis</u>, 36 F.3d 1424, 1436-37 (9th Cir. 1994) (noting that one who is solely a drug courier may be entitled to a lower sentence, in contrast to one who attends negotiations and leases the warehouse to which drugs were delivered); <u>United States v. Hoac</u>, 990 F.2d 1099, 1106 (9th Cir. 1993) (noting that defendant was more than a mere courier because defendant owned the trading company, leased the warehouse to which drugs were delivered, and attended foreign meetings to discuss shipments with coconspirators); <u>United States v. Flores-Payon</u>, 942 F.2d 556, 561 (9th Cir. 1991) (finding that district court

---

[15] The court in <u>Weber</u> also went on to conclude that the <u>Leon</u> good faith exception did not apply. <u>Id.</u> at 1346.

properly rejected defendant's arguments that he was a minor participant because he was a "mule" or a "courier" because defendant attended negotiations and commented on the quality of drugs); <u>Roberts v. Corrothers</u>, 812 F.2d 1173, 1181 (9th Cir. 1987) (examining parole guidelines and noting that a person with no special skills hired as a courier of drugs is considered a person with a peripheral role, rather than a managerial role, in a drug conspiracy); <u>United States v. Grant</u>, 524 F. Supp. 2d 1204, 1217-18 (C.D. Cal. 2007) (noting that "peripheral offenders" such as couriers are not as culpable as "Principal Drug Traffickers" who manufacture and distribute drugs). The affidavit conclusorily states Underwood is a courier and does not even allege that Underwood was a trafficker. Thus, there is no support in the affidavit for the proposition that the records or inventory that drug traffickers would normally maintain would be present in the home of a courier. Nor does the affidavit explain why a courier, as opposed to a trafficker, would maintain records or inventories for long periods of time, especially when the courier's only demonstrated participation in the alleged conspiracy was a single delivery made three months earlier.

The Court concludes that the state affidavit's allegation that Underwood was a courier and delivered crates containing ecstasy on one occasion, even if assumed to be non-conclusory, is based on stale information. Considering the nature of the alleged crime (being a courier of contraband on one occasion) and the three-month delay, there was no probable cause that evidence of a multi-hundred thousand pill MDMA drug conspiracy would be found at the Mansa Residence.

### C. Good Faith Exception

A finding that a search warrant is defective under the Fourth

Amendment does not automatically require suppression under the exclusionary rule. In <u>United States v. Leon</u>, the Supreme Court held that the exclusionary rule does not apply when an officer reasonably relies on a detached magistrate's issuance of a search warrant, even if it is later determined that the warrant was not supported by probable cause. 468 U.S. 897, 922-23 (1984). The Court reasoned that where police conduct is pursued in objective good faith, the deterrent effect of the exclusionary rule loses much of its force. <u>Id.</u> at 919. The Supreme Court identified four situations when the good faith exception cannot apply: (1) when the affiant knowingly or recklessly misleads the judge with false information; (2) when the judge wholly abandons his or her neutral role; (3) when the affidavit is so lacking in indicia of probable cause that official belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that executing officers cannot reasonably presume it to be valid. <u>Id.</u> at 923. The third situation is at issue in this case.

"Good faith reliance exists if the agents' affidavit establishes at least a colorable argument for probable cause, and the agents relied on the search warrant in an objectively reasonable manner." <u>Millender v. County of Los Angeles</u>, 620 F.3d 1016, 1033 (9th Cir. 2010) (en banc) (quotations omitted); <u>see also</u> <u>United States v. Hove</u>, 848 F.2d 137, 140 (9th Cir.1988). The objective standard "requires officers to have a reasonable knowledge of what the law prohibits." <u>Leon</u>, at 919-20 n. 20. However, the Ninth Circuit has also taken into account the fact that police officers are not lawyers, and must often make hurried judgments. <u>Luong</u>, 470 F.3d at 903 (considering time pressure as one factor in good faith determination but holding that time pressure did not overcome

deficiencies in warrant); <u>Weber</u>, 923 F.2d at 1346 (considering time pressure but finding good faith exception inapplicable because warrant was "bare-boned").

In determining whether the good faith exception applies, the Ninth Circuit has emphasized the "distinction between warrants with disputable probable cause and warrants so lacking in probable cause that no reasonable officer would view them as valid." <u>Id.</u> (quoting <u>KRL v. Estate of Moore</u>, 512 F.3d 1184, 1190 (9th Cir. 2008)) (internal quotation marks omitted). The burden of demonstrating good faith rests on the government. <u>United States v. Kow</u>, 58 F.3d 423, 428 (9th Cir. 1995); <u>United States v. Clark</u>, 638 F.3d 89, 100 (2d Cir. 2011); <u>see also</u>  <u>Malley v. Briggs</u>, 475 U.S. 335, 345-46 (1986); <u>Greenstreet v. County of San Bernardino</u>, 41 F.3d 1306, 1310 (9th Cir. 1994).[16]

### (1)  Facts in State Affidavit Present No Colorable Argument For Probable Cause

In this case, Underwood essentially argues that <u>Leon</u> is inapplicable because the affidavit contains no facts supporting a colorable basis for probable cause – i.e., it is a "bare-bones" affidavit.  Courts have recognized the inherent flaw in affidavits that fail to present facts that would allow even a colorable argument that probable cause exists by holding the <u>Leon</u> good faith exception does not apply to "bare-bones" affidavits.  <u>See</u>, <u>e.g.</u>, <u>Leon</u>, 468 U.S. at 915

---

[16] Qualified immunity cases involving deficient warrants are equally applicable in this context.  In <u>Malley v. Briggs</u>, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), the Supreme Court held that police officers seeking arrest warrants are entitled to qualified immunity for their actions unless "the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable. . . ." <u>Id.</u> at 344-345, 106 S.Ct. at 1098. The Court reasoned that this qualified immunity analysis involved the same determination as the <u>Leon</u> good faith analysis.  <u>Id.</u>

("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.") (quoting <u>Gates</u>, 462 U.S. at 239) (internal quotations omitted); <u>United States v. West</u>, 520 F.3d 604, 610-11 (6th Cir. 2008) ("The <u>Leon</u> good faith exception does not apply to rescue a warrant issued on the basis of a bare-bones affidavit.") (quoting <u>United States v. McPhearson</u>, 469 F.3d 518, 525-26 (6th Cir. 2006); <u>United States v. Pope</u>, 467 F.3d 912, 920 (5th Cir. 2006) ("Bare-bones affidavits typically contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause.") (internal quotations omitted); <u>United States v. Weaver</u>, 99 F.3d 1372, 1378 (6th Cir. 1996) (holding that "[a]n affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare-bones' affidavit" and that the <u>Leon</u> good faith exception was inapplicable to the 'bare-bones' affidavit at hand); <u>United States v. Wilhelm</u>, 80 F.3d 116, 121-22 (4th Cir. 1996) (following the Sixth and Fifth Circuits in holding that the <u>Leon</u> good faith exception does not apply in the case of a bare-bones affidavit); <u>United States v. Brown</u>, 941 F.2d 1300, 1303 (5th Cir. 1991) ("The affidavits must supply the magistrate with sufficient information to determine that probable cause exists."); <u>United States v. Barrington</u>, 806 F.2d 529, 532 (5th Cir. 1986) (holding the good faith exception does not apply to a bare-bones affidavit); <u>see also</u> <u>Weber</u>, 923 F.2d at 1344-46 (holding that once the affidavit was "stripped of its fat" there were no facts alleged that would suggest the defendant was a child molester or collector of child

pornography because defendant had only made one purchase of child pornography; therefore affidavit was "bare-bones" and no good faith exception applied to search for evidence of molestation and collection under Leon); LaFave § 1.3(f) n.118 ("Thus, Leon surely cannot be relied upon by the prosecution when the affidavit does not rise at all above the bare-bones level.") (citing cases).

The Government disputes that the affidavit is "bare-bones" because it presents two facts – the three month old delivery of undescribed crates and an observation of personal use marijuana. As the affidavit does allege two facts, the affidavit may not literally be described as "bare-boned." However, whether or not the affidavit is literally bare-boned, the ultimate test is whether the affidavit establishes at least a colorable argument for probable cause. Millender, 620 F.3d at 1033. As the Court discussed earlier in detail, the affidavit does not make a colorable showing of probable cause.

Furthermore, the delivery of crates occurred over three months before the state warrant was issued. The law is clear that "[a]bsent additional facts tending to show otherwise, a one-shot type of crime, such as a single instance of possession or sale of some form of contraband, will support a finding of probable cause only for a few days at best." LaFave § 3.7(a) at 375, f.n.13 (collecting cases); see also Johnson, 461 F.2d at 287 (quoted supra in Part III.B). The Government relies on authority in which the affidavits at issue established the existence of ongoing drug conspiracies. However, the state affidavit failed to present any facts supporting the contention

that Underwood was a participant in an ongoing drug conspiracy.[17]  Under these circumstances, where Underwood is an alleged courier who engaged in one observed delivery, no reasonable officer would rely on a warrant to search his residence three months after the delivery.  See <u>Hython</u>, 443 F.3d at 488-89 (holding good faith exception did not apply because observation of single drug transaction was stale because it was not dated and no further surveillance demonstrated indication of ongoing conspiracy); <u>United States v. Helton</u>, 314 F.3d 812, 822 (6th Cir. 2003) (noting timeliness concerns among other issues in search executed two months after anonymous tipster's observation of drug money in residence in determining that tipster was unreliable, and finding good faith exception did not apply); <u>United States v. Zimmerman</u>, 277 F.3d 426, 437 (3d Cir. 2002) (holding good faith exception did not apply because single video clip of pornography was traced to suspect's home six months prior to warrant's execution and circumstances did not involve hurried judgment); <u>United States v. Wilkins,</u> 2000 WL 1279477 (D. Kan. 2000) (suppressing evidence because evidence of three sales of crack on two different dates was at least four months old and there was no evidence in affidavit of ongoing conspiracy).

The Government has not met its burden in showing the good faith exception applies.  The Court holds that the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable.

**(2)  Government's Arguments Based on Factors Extrinic to**

---

[17] Although the affidavit does refer to "other seizures in this investigation" which were conducted over a five month period, none of these references are tied to Underwood and the statements are wholly conclusory.  Indeed, the only allegation tying Underwood to the alleged conspiracy is *a single delivery*.

## Facts Disclosed in State Affidavit

The Court's analysis would generally end after determining the state affidavit does not contain facts establishing even a colorable argument for probable cause.  However, the Government raises alternative arguments, extrinsic to the facts disclosed in the affidavit, in contending the good faith exception should apply.  The Government argues as follows: (1) that Detective Kaiser was under time pressure to secure the search warrant and that he made a technical error in believing he did not have to attach the federal affidavit; (2) that the officers had an objectively reasonable belief that there was probable cause because two separate judges issued search warrants; and (3) that any mistakes in issuing the state warrant should solely be attributed to the state judge, who could have requested the federal affidavit if probable cause was in doubt. The Court addresses each argument in turn.[18]

_____

[18] The Court addresses the Government's arguments even though they rely upon extrinsic factors outside the four corners of the affidavit.  On one hand, the Ninth Circuit's four corners rule announced in Hove and Luong could be read to exclude such arguments (except time pressure) from consideration.  See Luong, 470 F.3d at 904 (rejecting argument that court could look to facts orally conveyed to magistrate, but not stated within four corners of the affidavit itself, in determining whether good faith exception applies and distinguishing practice of Fourth and Fifth Circuits in considering these facts); Hove, 848 F.2d at 140 ("The Leon test for good faith reliance is clearly an objective one and it is based solely on facts presented to the magistrate.  An obviously deficient affidavit cannot be cured by an officer's later testimony on his subjective intentions or knowledge.") (internal citation omitted).  On the other hand, Ninth Circuit cases, including Ortiz v. Van Auken, 887 F.2d 1366, 1370-71 (9th Cir. 1989) and United States v. Luk, 859 F.2d 667, 677-78 (9th Cir. 1988), considered arguably extrinsic objective factors such as the advice of attorneys and technical mistakes, even though these factors involve the consideration of facts outside the four corners of the affidavit.

Under the Court's interpretation of Leon and these Ninth Circuit

29

The Government argues that coordinating multiple takedowns on the same day resulted in hurried judgments and therefore, the <u>Leon</u> exception should apply.  Although time pressure on police is one factor in determining whether there was objectively reasonable reliance on the

precedents, the Court will address the extrinsic factors raised by the Government.  <u>See</u> <u>Leon</u>, 468 U.S. at 922 n.23 ("[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.  In making this determination, all of the circumstances – including whether the warrant application had previously been rejected by a different magistrate – may be considered.").

However, it is also clear under <u>Luong</u>, <u>Hove</u>, and <u>Leon</u> itself, that an officer's unstated beliefs will not justify a finding of good faith.  <u>See</u> <u>Leon</u>, 468 U.S. at 922 n.23 (reasoning, in the same footnote allowing consideration of extrinsic factors, that "sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources") (internal quotations omitted).  The Court notes that other circuits have not limited their consideration of the good faith exception to the four corners of the affidavit and have held that an officer's subjective intentions or knowledge not known to the magistrate may be taken into account in determining whether the good faith exception applies.  <u>See</u> <u>United States v. Martin</u>, 297 F.3d 1308, 1319 (11th Cir. 2002) (citing first, fourth, fifth, sixth, seventh, eighth, and tenth circuit cases in holding that a court may look to facts outside the four corners of the affidavit in determining whether good faith exception applies).  Nonetheless, as discussed in <u>Martin</u>, the Ninth Circuit has expressly held that courts may not look to facts outside the four corners of the affidavit in determining whether the good faith exception applies.  <u>Id.</u> at n.11 (distinguishing <u>Hove</u>, 848 F.2d at 140, where court held that it could not rely upon officer's subjective intentions or knowledge not presented to the magistrate in applying good faith exception).

In any event, the Government does not argue that Detective Kaiser knew additional facts outside the four corners of the affidavit that support a good faith reliance on the issuance of the state warrant.  Even if the Government had raised such an argument and if it was available under Ninth Circuit law (which it is not), there is no evidence that Detective Kaiser read the federal affidavit or was aware of its contents.  The only evidence in the record is that Detective Kaiser had previously attended a briefing about the investigation on July 15, 2010 and that he had received a faxed document from Agent Johnson on July 22, 2010.  (Kaiser Decl., Doc. No. 360 Ex. 1 ¶ 2).  Neither this faxed document, nor the facts learned in the briefing are in the record.

warrant, claims of hurried judgments do not alone override a failure to make a colorable showing of probable cause.  See Weber, 923 F.2d at 1346 (holding time pressure insubstantial in face of "bare-boned" affidavit).  Moreover, in this case, the Government planned and controlled the timing of the search.  Id. (noting Government's control over timing of search in rejecting good faith arguments).  As Detective Kaiser described in the state affidavit, officers had taken Underwood into custody before the search warrant for the Mansa Residence was sought.  Further, officers had conducted a protective sweep of the Mansa Residence and knew there were no other suspects in the residence. Officers were also stationed outside the Mansa Residence, thereby insuring that evidence would not be destroyed.  Under these circumstances, the officers' decision to approach a state judge with a plainly deficient affidavit is not a basis for invoking the good faith exception.

Second, although two judges issued search warrants, the search warrants were supported by two wholly different affidavits and authorized searches of two different locations.  The Government relies heavily on Ortiz v. Van Auken, 887 F.2d 1366, 1370-71 (9th Cir. 1989). In Ortiz, an anonymous tipster called four separate agencies with specific allegations that he had observed a house containing cocaine, AR 16 rifles, hand grenades, machine guns, Uzi-brand weapons, and high explosives.  A city police officer in charge of the investigation performed independent research and contacted a deputy district attorney to seek guidance on whether he had probable cause to search the house. The deputy district attorney confirmed that there was probable cause. Next, the police officer provided the same information to a judge, who

issued a search warrant, again confirming that there was probable cause to search the house.  In reversing the district court's denial of summary judgment on qualified immunity, the Ninth Circuit reasoned that the officer's conduct was sufficiently reasonable under the circumstances, particularly because the officer sought guidance and approval from two different lawyers before conducting the search.  Both lawyers, upon considering the *same information*, agreed there was sufficient evidence to establish probable cause to search the house. <u>Id.</u> at 1371.  The Ninth Circuit held that "[t]he specificity of the informant's information, the multiple telephone calls, and the fact that both Deputy District Attorney Witt and Judge Van Auken, each of whom had substantial legal training and experience, concluded that there was probable cause to issue a warrant combine to indicate that Spencer's belief was not 'entirely unreasonable.'" <u>Id.</u> at 1370; <u>but</u> <u>see</u> <u>United States v. Kow</u>, 58 F.3d 423, 429 (9th Cir. 1995) (holding that mere fact that two AUSAs and a magistrate judge reviewed the warrant does not mean an officer reasonably relied on a warrant that was facially invalid); <u>Hove</u>, 848 F.2d at 139 (holding good faith exception did not apply even though district attorney and magistrate reviewed affidavit).

Unlike in <u>Ortiz</u>, there is no evidence that the state affidavit was reviewed by an attorney before it was submitted to the issuing judge. The Government argues that Magistrate Judge Kenton was the first "attorney" to review the affidavit.  However, this argument is unavailing because Magistrate Judge Kenton reviewed the *federal*

affidavit, and not the very different *state* affidavit.[19]  Moreover,

there is no evidence that Detective Kaiser actually knew what was in

the federal affidavit.  Under such circumstances, the Government's

argument that Detective Kaiser reasonably relied upon the issuance of

the federal warrant belies the reasoning of <u>Ortiz</u>.  In any case, even

if Detective Kaiser had reviewed the federal affidavit, he would have

known the affidavits were entirely different.  The federal affidavit

contained a detailed history of wiretapped conversations, including

conversations between Underwood and co-conspirators, and observations

that crates resembling those that Underwood delivered were later found

containing 130,000 pills of ecstasy each.  On the other hand, the state

affidavit did not present any facts that made even a colorable argument

as to probable cause.  The reasoning of <u>Ortiz</u>, which held that an

officer was objectively reasonable for relying on the approval of two

lawyers who had considered the *same set of facts* in independently

finding probable cause is therefore inapplicable.[20]  Moreover, the court

---

[19] The Supreme Court's reasoning in <u>Leon</u> is inapplicable for the same
reasons.  In <u>Leon</u>, the Court noted a prior magistrate's *rejection* of
a warrant application was just one factor in "all of the
circumstances" that should be considered in making the good-faith
determination.  <u>Leon</u>, 468 U.S. at 922 n.23.  More importantly, the
Court only found relevant a prior rejection of the *same* warrant
application by a different magistrate, not the situation at hand.
<u>Id.</u>; LaFave § 1.3(e) at 72.  By contrast, in this case, the
Government argues that the approval of a *different* warrant
application by a different magistrate should constitute a basis for
good faith reliance.

[20] Furthermore, unlike in <u>Ortiz</u> where a search warrant was sought for
only one location, the federal affidavit sought a search warrant for
the Cantrece Residence, while the state affidavit sought a search
warrant for the Mansa Residence.  "[I]n the case of multi-location
search warrants, the magistrate must be careful to evaluate each
location separately." <u>Greenstreet v. County of San Bernardino</u>, 41
F.3d 1306, 1309 (9th Cir. 1994) (holding that the disclosure that a

33

in *Ortiz* noted the specificity of the informant's information. Here, Detective Kaiser presented an affidavit that lacked even this degree of specificity.

The Government suggests that the failure to attach the federal affidavit was merely a technical error and cites to *United States v. Luk*, 859 F.2d 667, 677-78 (9th Cir. 1988). However, *Luk* has little applicability to this case.[21] In *Luk*, the court found that the warrant was not "facially overbroad" (a different exception to *Leon*)[22] even though the affidavit that provided particularity for items to be searched was not properly incorporated by reference in the warrant application. The Ninth Circuit noted that the purpose of the unincorporated affidavit was to limit the search to items for which probable cause existed. *Id.* at 677. The Ninth Circuit reasoned that although the affidavit was mistakenly not incorporated by reference and attached, there was actual evidence that the officers executing the search relied on the affidavit to limit their search. *Id.* at 678. Unlike *Luk*, in this case, Detective Kaiser admits that he never intended to attach the federal affidavit and that he did not fail to do

first search warrant application for a residence was granted in a second search warrant application for a different residence was not, in itself, sufficient to support probable cause for second warrant application).

[21] Moreover, *Luk* appears to have been limited by subsequent Ninth Circuit cases. *See Kow*, 58 F.3d at 429; *Center Art Galleries-Hawaii, Inc. v. United States*, 875 F.2d 747, 750 (9th Cir. 1989).

[22] Though this exception shares some similarities with the third exception under the circumstances in this case, it seemingly only applies when the warrant is "so facially deficient - i.e., in failing to particularize the place to be searched or the things to be seized - that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923.

so due to some technicality.  Instead, Detective Kaiser states that he mistakenly believed that he was not required to attach the federal affidavit unless the issuing judge specifically requested it.  Kaiser Supp. Dec. ¶ 6 (Doc. No. 398).  As discussed below, no reasonable officer would believe the issuing judge bore the burden of exploring whether additional evidence existed to support probable cause.[23] Moreover, though the officers in <u>Luk</u> were able to cure the warrant's overbreadth by relying on the contents of the affidavit during their search, no similar cure is available when the deficiency is the failure to articulate colorable probable cause.

Nor was the error in issuing the warrant solely on the part of the issuing judge.  See <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 984, 989-90 (1984) (holding that suppression was improper in case where officer presented an affidavit to neutral judge, who told officer that he would make necessary changes to fix the warrant, but failed to make the changes).  The Government cites to <u>Garcia v. County Of Merced</u>, __ F.3d __, 2011 WL 1680388 (9th Cir. May 5, 2011) for the proposition that the issuing judge had the responsibility to ask for further facts supporting probable cause.  However, <u>Garcia</u> stands for no such proposition.  In <u>Garcia</u>, the plaintiff sued police officers for an illegal search, arguing that the officers omitted material information in the application for a search warrant.  The search warrant was based on corroborated statements of a jailhouse informant and a sting operation observed by investigators.  The plaintiff alleged that the officers omitted material information of the jailhouse informant's

---

[23] <u>See</u> <u>Leon</u>, 468 U.S. at 919 n.20 ("The objective standard we adopt, moreover, requires officers to have a reasonable knowledge of what the law prohibits.").

extensive criminal record such that the issuing judge was deliberately
mislead into issuing the warrant.  However, the court in <u>Garcia</u> found
that given the fact that the officers had disclosed that the informant
was a jailhouse informant – someone who can always be presumed to be
looking for consideration in exchange for  information – the issuing
judge had been sufficiently alerted to the informant's suspect
character.  <u>Id.</u> at *5.  The court reasoned that the issuing judge did
not ask about the informant's convictions presumably because the judge
understood that the informant was untrustworthy by virtue of his
status, and this was not a case where the officers intentionally
withheld the information.  <u>Id.</u>  Thus, the court held that the officers
did not deliberately mislead the issuing judge by failing to
specifically disclose the jailhouse informant's criminal record.  <u>Id.</u>

        The <u>Garcia</u> decision does not stand for the proposition that a
neutral and detached magistrate must affirmatively seek information
supporting probable cause when the affidavit is deficient.  The
Government's reading of <u>Garcia</u> and <u>Leon</u> would turn the warrant
requirement and exclusionary rule on its head by placing the burden on
*judges* to explore whether additional facts supporting probable cause
may exist.  It is a cornerstone of <u>Leon</u> that even if a magistrate
erroneously issues a search warrant, officers may not rely on the
warrant if the affidavit is so lacking in indicia of probable cause
that official belief in the existence of probable cause is objectively
unreasonable.  Although the issuing judge here erroneously found
probable cause existed, the Government now attempts to transfer the
duty of establishing probable cause to the issuing judge.  However,

this is not the law.[24]  If judges bore this burden, the exclusionary

rule would be all but inapplicable except in cases involving

affirmative deception.

Thus, at the time the state warrant was sought, the law was clear

that all facts necessary to establish probable cause must be included

within the four corners of the affidavit.  <u>Luong</u>, 470 F.3d at 904

(rejecting government's invitation to look to facts orally conveyed to

the magistrate to establish good faith exception under <u>Leon</u> where

affidavit itself was entirely lacking in indicia of probable cause);

<u>United States v. Anderson</u>, 453 F.2d 174, 175 (9th Cir. 1971) (holding

that all data necessary to show probable cause must be within four

corners of a written affidavit given under oath); LaFave § 1.3(f)

("[A]dditional facts, which the government proved were known to the

affiant police officer, but not revealed to the magistrate prior to the

issuance of the search warrant, could [not] be considered in the Leon

analysis, for allowing such consideration would undercut Fourth

Amendment protections, and be at odds with the very purpose of the <u>Leon</u>

good faith exception.") (internal citations and quotations omitted).

It was also clearly established that an officer's wholly conclusory

statements did not establish probable cause.  <u>See</u> <u>Ventresca</u>, 380 U.S.

at 108-09; f.n. 5 *supra*.  Based on these two well-established

---

[24] This is not to say, as the Government contends, that the Court's
reasoning treats judges as "potted plants." Judges often seek
clarification from the Government in the warrant context.  In cases
involving challenges to a magistrate's neutrality, courts have upheld
warrants even though a magistrate judge rendered assistance in the
preparation of a warrant affidavit.  <u>See</u> LaFave § 4.2(d) (citing
cases); <u>c.f.</u> LaFave § 4.2(b) (noting a magistrate's excessive
encouragement and intimate participation in the warrant process may
taint the magistrate's impartiality).

principles alone, a reasonable police officer would know that he had to present sufficient *facts* to allow the judge to make an independent determination of probable cause.  See <u>Anderson</u>, 446 F.2d at 275 ("[A]n affidavit must supply sufficient factual information to support an independent judgment that the affiant's recitations regarding the commission of a crime are probably true.").  A reasonable officer would not believe that he could obtain a warrant based on nothing more than an assertion that a different judge had issued a warrant a week earlier for a different location based on a different affidavit.

**IV.  Conclusion**

For the reasons stated above, the Motion to Suppress is GRANTED.

IT IS SO ORDERED.

DATED:  June 16, 2011

_____
STEPHEN V. WILSON
UNITED STATES DISTRICT JUDGE